1

2

3

4

5

6

7

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

8

S.M.F. and A.R.M.,[1]

9

Plaintiffs,

Case No. 2:22-cv-1193

10

v.

**COMPLAINT**

11

UNITED STATES OF AMERICA,

Defendant.

12

13

**INTRODUCTION**

14

1.      In 2018, the United States implemented an unprecedented policy of intentionally

15

separating asylum-seeking parents and children at the nation's southern border. While the policy

16

was in effect, U.S. officials systematically and forcibly took children from their parents, causing

17

extraordinary trauma to thousands of families. Plaintiffs became victims of this horrific policy

18

when government officials ripped six-year-old A.R.M. away from her mother S.M.F. and sent

19

her to an undisclosed location across the country. The mother and child were separated for over

20

two months.

21

22

23

[1] Plaintiffs are concurrently filing a motion for leave to proceed under pseudonyms, in order to protect their identities from public disclosure and thereby to minimize the risk of compounding the trauma they have experienced as a result of Defendant's unlawful policy and actions. Plaintiffs have already disclosed their full names to the relevant government agencies in their administrative claims filed in accordance with 28 U.S.C. § 2675.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

2.      The trauma that Plaintiffs and other parents and children suffered was not an incidental byproduct of the policy. It was the very point. The government *sought* to inflict extreme emotional distress and other harms on migrant families by forcibly separating them, and then to use that trauma and the media reporting regarding the separations to coerce arriving immigrants into giving up on their asylum applications and to deter future asylum seekers.

3.      Federal officials at the highest levels of government repeatedly made public statements acknowledging that this was the policy's purpose. Despite widespread condemnation and a federal-court injunction requiring the government to reunite separated families and to stop further separations, former president Donald J. Trump defended the policy as a deterrent to migration from Central America. Even months after a federal court had ordered an end to the policy, the former president stated on Twitter: "if you don't separate, FAR more people will come." Donald J. Trump (@realdonaldtrump), Twitter (Dec. 16, 2018, 11:25 a.m.), https://twitter.com/realDonaldTrump/status/1074339834351759363 [https://web.archive.org/web/20181218231233/https://twitter.com/realDonaldTrump/status/1074339834351759363].

4.      Plaintiffs' claims concern the entirely predictable—and actually *intended*—harms caused by Defendant's unprecedented policy and practice of systematically separating asylum-seeking parents and children. Defendant's employees forcibly separated Plaintiffs after they entered the United States in May 2018. They then detained Plaintiffs in separate facilities thousands of miles apart, keeping S.M.F. in Texas while forcibly transferring A.R.M. to a facility in New York. S.M.F. was unable to hold her daughter again until the end of July 2018—when they were finally reunited in Seattle after more than two months of forced separation. It was only then that she found out that A.R.M. had been detained across the country throughout that time.

COMPL. – 2
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

5. Plaintiffs suffered significant physical and emotional harm as a direct result of Defendant's unlawful conduct and violation of Plaintiffs' constitutional and statutory rights. A.R.M., in particular, who was separated from her mother at age six, suffered catastrophic emotional and mental harm that continues to this day, and which likely will mark the rest of her life. Yet that is *exactly* what Defendant intended: to destroy children's familial ties, to cause them lasting nightmares, to make them question the love of their own parents, and to induce panic and fear by ripping them from the most important person in their lives.

6. Plaintiffs bring this action to seek compensation for the extraordinary harms they suffered at the hands of the federal government.

7. Defendant is liable for this conduct under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b)(1), 2671 *et seq.*

## JURISDICTION & VENUE

8. This Court has jurisdiction over the subject matter of this Complaint under 28 U.S.C. §§ 1331 (federal question), 1346(b) (United States as defendant).

9. On May 5, 2020, Plaintiffs submitted a Notification of Incident and Claim for Damages Under the Federal Tort Claims Act to each agency Defendant. Each Plaintiff also completed a Standard Form 95 and provided a detailed description of the basis of her claim.

10. Defendant has not responded, much less made a final disposition of Plaintiffs' administrative claims.

11. Because Defendant failed to make a final disposition of Plaintiffs' claims within six months, Plaintiffs' claims are deemed finally denied. *See* 28 U.S.C. § 2675(a). Accordingly, Plaintiffs have exhausted all potential administrative remedies.

COMPL. – 3
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

12.     Venue is proper in the Western District of Washington under 28 U.S.C. § 1402(b) because Plaintiffs reside in this District.

**PARTIES**

13.     Plaintiff S.M.F. is a citizen of Honduras who resides in Seattle, Washington. Fearing persecution and torture, she fled Honduras with her daughter, A.R.M., and sought refuge in the United States.

14.     Plaintiff A.R.M.is a citizen of Honduras who resides in Seattle, Washington. With her mother, S.M.F., A.R.M. fled persecution and torture in Honduras and sought refuge in the United States. A.R.M. was six years old at the time of the forced separation described in this Complaint, and was a minor at all times during which Defendant's employees detained her.

15.     The United States of America has waived sovereign immunity as to claims brought under the FTCA, and is properly named as a defendant to each of Plaintiffs' claims under the Act. 28 U.S.C. § 2679(a).

**FACTUAL ALLEGATIONS**

**Defendant's Employees Subjected Plaintiffs to Inhumane Detention Conditions and Forcibly Separated Them When They Entered the United States to Seek Asylum.**

16.     S.M.F. and A.R.M. are a mother and daughter who fled persecution and torture in Honduras to seek asylum in the United States.

17.     Plaintiffs entered the United States on or about May 10, 2018, near El Paso, Texas. Shortly after they crossed the border, U.S. Customs and Border Protection (CBP) officers arrested and questioned Plaintiffs and the people with whom they were traveling, loaded them into a van, and transported them to a nearby detention center.

18.     Immigration officers took Plaintiffs to a CBP facility known as the "*hielera*," or "ice box," because of its frigid temperatures. Once they arrived at the facility, a male CBP

COMPL. – 4
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

officer ran a security wand over S.M.F.'s body, remarking that coming to the United States was not good for her because of the "new law." Officers then placed S.M.F. in a separate room, where a female officer told her to remove all her clothing except for her underwear and searched her body with her hands. S.M.F. felt humiliated and degraded. The officer then confiscated her belongings, including her bag, phone, identification, and her six-year-old daughter's asthma inhaler.

19.     S.M.F. and A.R.M. were initially detained together in the *hielera* for two nights. Temperatures in the *hielera* were so cold that S.M.F. and other mothers had to crowd together to keep the children warm. S.M.F. and A.R.M. were forced to sleep on a freezing cement floor with only a single aluminum blanket, and with all the lights kept on. The mothers used toilet paper from the bathroom to create makeshift pillows for their children.

20.     The cold temperatures exacerbated A.R.M.'s asthma symptoms, so S.M.F. asked the officers for the inhaler that had been confiscated earlier. The officers returned the inhaler but did not offer any type of medical assistance despite A.R.M.'s noticeable coughing, as well as allergic skin reactions related to her asthma. Indeed, no medical attention appeared to be available at the *hielera*.

21.     S.M.F. and A.R.M. were unable to shower or bathe because the *hielera* had no running water, soap, or sanitizer. Each person at the *hielera* was provided one small burrito and one small bottle of water three times a day. The meal was so small that most of the mothers gave their food to their children. Those who requested additional food or water did not receive any.

22.     At some point after entering the facility, S.M.F. was called to an officer's desk for questioning. She left A.R.M. with the other mothers as she went inside, but A.R.M. could still overhear the conversation between the officer and S.M.F. An officer who spoke Spanish told

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

S.M.F. that she would be separated from her daughter for the crime of having entered the country illegally. When S.M.F. stated that she does not want to be separated from her daughter, the officer told her that she could sign a document and be returned to her country. S.M.F. expressed that she was afraid to return to Honduras, did not want to sign a document she did not understand, and wanted to speak with a lawyer. The officer sent S.M.F. back into the cell.

23.     When S.M.F. returned to the cell, A.R.M. asked her where she would be going. S.M.F. tried to comfort A.R.M., but felt afraid. While in the cell, S.M.F. and A.R.M. regularly witnessed officers entering the room, calling out a name, and taking children away from their mothers. S.M.F. and A.R.M. watched and listened to the screams and cries of both mothers and children as they were forcibly separated.

24.     Early on the morning of May 13, 2018, officers called out S.M.F.'s name. When she identified herself, an officer said to her, "You know what's coming. We're going to take your daughter from you." S.M.F. felt a profound sense of fear, and A.R.M. began to cry. S.M.F. told her daughter not to worry, and that they would soon be together again. S.M.F. and A.R.M. clung to each other, not wanting to let go, but the officers eventually led A.R.M. away.

25.     A woman who was introduced as a "social worker" arrived at the facility and told S.M.F. to say goodbye to her daughter. S.M.F. asked where A.R.M. would be taken and for how long, and the social worker responded that she did not know, and that she was only doing her job.

26.     Initially, A.R.M. was taken without her jacket and returned a few minutes later to retrieve it. During her brief return, she told her mother that she would ask God for them to be together again soon and gave her a tight hug. The social worker told them that A.R.M. had to leave; as the six-year-old left her mother, she waved and blew kisses, walking down the hallway.

COMPL. – 6
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

S.M.F. began to sob uncontrollably as soon as her daughter was out of her sight. She felt that she had lost her child and did not know if she would ever see her again. No one ever told her where A.R.M. was being taken.

27.     S.M.F. and A.R.M. would not see each other again for more than two months.

28.     The same day A.R.M. was forcibly taken from S.M.F., Defendant's employees transported S.M.F. to a new detention facility.

29.     At or around this same time that CBP separated S.M.F. and A.R.M. and moved them to different facilities, Assistant United States Attorney Greg McDonald approved federal prosecution of S.M.F. under 8 U.S.C. § 1325. This prosecution was approved pursuant to the Department of Justice's new "Zero Tolerance" policy, as indicated by the Department of Homeland Security (DHS)'s record of S.M.F.'s arrest on Form I-213, Record of Deportable/Inadmissible Alien.

30.     According to federal court documents from the Western District of Texas, a criminal complaint for illegal entry in violation of 8 U.S.C. § 1325 was filed against S.M.F. on May 14, 2018.

31.     S.M.F. remained in federal criminal custody until her arraignment on May 30, 2018, where she pleaded guilty and was sentenced to time served. She was returned to immigration custody immediately thereafter.

32.     S.M.F.'s prosecution under 8 U.S.C. § 1325 was carried out pursuant to a policy launched by the Department of Justice on April 6, 2018. That day, then-Attorney General Jefferson Beauregard Sessions III publicly announced a new "Zero Tolerance" policy to all U.S. Attorneys along the southern border, including in Texas, directing them to prosecute every adult who committed the misdemeanor of unlawful entry or re-entry under 8 U.S.C. § 1325(a).

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

Previously, asylum seekers, especially families, had rarely been referred for prosecution under this Section. *See, e.g.*, William A. Kandel, Cong. Rsch. Serv., R45266, The Trump Administration's "Zero Tolerance" Immigration Enforcement Policy 6 (2021).

33.     The "Zero Tolerance" directive was conceived of and developed by Attorney General Sessions, Secretary of Homeland Security Kirstjen Nielsen, White House Advisor Stephen Miller, and others.

34.     The policy was a pretext or cover for the federal government's goal of carrying out the widespread and systematic separations of Central American parents and children along the southern border. Indeed, Defendant Nielsen later admitted under oath before the House Homeland Security Committee that she had discussed imposing widespread family separations with Sessions prior to the "Zero Tolerance" announcement. Several reports from Congress and government agencies, including the Department of Justice's Inspector General's Office, have since confirmed that the policy was intended to separate families and to deter asylum seekers. *See, e.g.*, Dep't of Justice, Off. of Inspector Gen., No. 21-028, Review of the Dep't of Justice's Planning and Implementation of Its Zero Tolerance Policy (2021); Majority Staff of H. Comm. on the Judiciary, 116 Cong., The Trump Administration's Family Separation Policy: Trauma, Destruction, and Chaos (Comm. Print 2020); *see also* Caitlin Dickerson, "An American Catastrophe: The Secret History of the U.S. Government's Family Separation Policy," *The Atlantic* (Aug. 7, 2022).

35.     After the announcement of the "Zero Tolerance" policy, a parent who entered the U.S. without inspection would typically be prosecuted under 8 U.S.C. § 1325, but receive a sentence of time served. In the brief time the parent was held in federal pre-trial custody, the child would be taken away, often flown across the country, and not returned to the parent even

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

after the parent was returned to immigration custody. Or, in other cases, the child would be forcibly taken away while the parent was still in immigration custody.

36.     As with most Zero Tolerance prosecutions under 8 U.S.C. § 1325(a)(1), S.M.F. was sentenced to time served. Following her sentencing, S.M.F. was returned to immigration custody.

37.     Even though S.M.F. was in federal pre-trial criminal custody for only a brief time, Defendant's employees used S.M.F.'s federal court proceedings and prison sentence to designate A.R.M. an "unaccompanied minor." *See* 8 U.S.C. § 1232(b)(1); 6 U.S.C. § 279(b). Specifically, once the Department of Justice initiated the criminal case against S.M.F., Defendant's employees used the process that followed, including her required court hearings and her placement in federal pre-trial criminal custody, to render A.R.M. "unaccompanied." Defendant's employees continued that designation for weeks *after* S.M.F. was sentenced to time served and her case completed, even though there was no longer any basis to consider A.R.M. unaccompanied.

38.     As a result of the "unaccompanied minor" designation, CBP and U.S. Immigration and Customs Enforcement (ICE) determined A.R.M. to be legally in the custody of the Department of Health and Human Services' Office of Refugee Resettlement (ORR). *See* 8 U.S.C. § 1232(b); 6 U.S.C. § 279. ICE and CBP made that determination even though S.M.F. and A.R.M. entered the country and were arrested and placed in immigration custody *together*, and S.M.F. was in federal pre-trial criminal custody for only a brief time.

**Defendant's Employees Subjected S.M.F. to Inhumane Detention Conditions and Severe Emotional Distress.**

39.     For nearly one month after entering the United States and being forcibly separated from her daughter, S.M.F. was detained in various Texas facilities under harsh conditions. At one facility, S.M.F. and many other women had to sit on the floor because they were held in a

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

large room with only two benches in it. S.M.F. was also forced to sleep on the floor, on thin mats with no blankets. As in the first *hielera*, temperatures were freezing, and the lights were left on all night.

40.     Each time S.M.F. was transferred between facilities, she was shackled to other women in lines, with their hands bound together to their waists and their ankles bound tightly.

41.     Throughout her month in detention, Defendant's employees refused to inform S.M.F. of A.R.M.'s location, and they refused to facilitate any direct communication with her daughter. Even though S.M.F. continuously asked the officers in detention, they refused to provide any information about A.R.M. or the reunification process, exacerbating her concern over her daughter's safety and wellbeing. The officers consistently responded that they could not provide her with any information about her daughter or when she would see her again.

42.     S.M.F. spent many nights crying while in detention. She suffered overwhelming anxiety and distress as a result of being denied any information regarding A.R.M.'s whereabouts or whether and when they would be reunited. On some days, she felt so desperate that she felt that she did not want to live any more. She feared that she would never be able to see her daughter again.

43.     S.M.F. also grew concerned because she saw women being removed from the United States without their children. At some point during her detention, an officer told her that she should sign documents agreeing to her removal and that her daughter would be returned to her after her deportation. S.M.F. refused to do so.

44.     Defendant's employees' chaotic launch of the Zero Tolerance policy, as well as their failure to provide even the most basic safeguards when launching the policy, caused and

COMPL. – 10
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

worsened S.M.F.'s and A.R.M.'s difficulties in connecting and reuniting, even after S.M.F.'s

release from immigration custody.

45.     As reports from Congress, the Department of Justice's Inspector General, and the

Government Accountability Office have explained, Defendant's employees failed to adequately

track separated family members. Defendant's employees also failed to provide the Office of

Refugee Resettlement with notice that DHS would dramatically expand the number of

"unaccompanied" child referrals, thereby overwhelming ORR's capacity to deal with cries for

help from parents like S.M.F. who anguished over the location of their separated children. Nor

did ORR take significant steps to prepare for the dramatic expansion of "unaccompanied"

children. *See, e.g.*, Dep't of Justice, Off. of Inspector Gen., No. 21-028, Review of the Dep't of

Justice's Planning and Implementation of its Zero Tolerance Policy and Its Coordination with the

Departments of Homeland Security and Health and Human Services (Jan. 2021); Majority Staff

of H. Comm. on the Judiciary, 116th Cong., Rep. on the Trump Administration's Family

Separation Policy: Trauma, Destruction, and Chaos (Comm. Print 2020); U.S. Gov't

Accountability Off., GAO-19-163, Unaccompanied Children: Agency Efforts to Reunify

Children from Parents at the Border (2018); *see also* Dickerson, *supra* p. 8.

46.     Such failures predictably caused significant harm to both children and parents,

including S.M.F. and A.R.M., as they were unable to contact one another or even learn the most

basic information about the other's whereabouts, safety, and health.

47.     On or around June 2, 2018, while she was still detained, S.R.M. was brought to a

large room with about 100 other people and bunkbeds. That day, S.R.M. was able to contact her

husband for the first time since she had entered the United States nearly a month ago. Her

husband, who had remained in Honduras, informed S.R.M. that he had been able to

COMPL. – 11
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

communicate with A.R.M. at the end of May for the first time. He stated that the call was a very short video call that consisted mostly of saying only hello and goodbye. A.R.M. cried profusely on that call.

48.     On June 8, 2018, S.M.F. was released from detention. Before being released, S.M.F. asked officers for help with how to find information about her daughter, but they responded that they did not have any information, only providing a document with contact information for various shelters.

49.     S.M.F. traveled on a bus for around three days and arrived at a family member's home in Washington State. From her new home in Washington State, S.M.F. contacted her husband, who, as noted above, was still in Honduras at the time. Her husband had learned that A.R.M. was staying at a shelter in New York and had managed to speak with a social worker, but he did not have any other information regarding A.R.M.'s location.

50.     Shortly after arriving in Washington, S.M.F. called the social worker that her husband had spoken with. The social worker told S.M.F. that A.R.M. was in New York with "substitute parents," but provided no other information. Further, the agency with whom A.R.M. had been forcibly placed only allowed only short, monitored video calls approximately once a week.

51.     During these monitored calls, S.M.F. had the sense that there was someone next to A.R.M., preventing her from speaking freely.

52.     When S.M.F. asked her daughter where she was, a social worker interrupted and told S.M.F. that they could not share information about A.R.M.'s location or the "substitute parents" because that information was confidential.

COMPL. – 12
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

53.     During these video calls, S.M.F. noticed that her daughter looked very thin and unwell. A.R.M. was also reserved and distant, completely different from her regular, gregarious personality. When S.M.F. asked her whether she was doing well, A.R.M. appeared to look up off camera and to another person, and would then refuse to answer the question.

54.     Before reuniting S.M.F. with her daughter, she was subjected her to a lengthy process of gathering and submitting documentation to prove her relationship with and her daughter, even though they were well aware of S.M.F. and A.R.M.'s relationship. Sometimes, the social worker would reject documents that S.M.F. provided as being incorrect without explaining what needed to be fixed, further prolonging the release request.

55.     Finally, in July 2018, A.R.M. was released to S.M.F. It was only then that S.M.F. learned that her daughter had been held at a shelter operated by Cayuga Centers.

**Defendant's Employees Inflicted Lasting Psychological and Emotional Damage to A.R.M. and Put Her at Physical Risk.**

56.     After being forcibly separated from her mother in May 2018, A.R.M. was taken to another detention facility in Texas, where she was placed in a cell with around five other girls. The cell was always kept locked. A.R.M. asked the officers at the facility when her mother would come back, and they told her that she would be back the next day. A.R.M. felt angry and sad when S.M.F. did not appear the following day.

57.     Within a few days, A.R.M. was taken to a transitional shelter operated by Cayuga Centers in New York.  A.R.M. was introduced to three other children and one adult woman who A.R.M. was told was her temporary mother.

58.     Cayuga Centers is a non-profit organization that contracts with the Office of Refugee Resettlement (ORR) to provide services to unaccompanied immigrant children.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

59.     Because DHS and ICE designated A.R.M. an unaccompanied minor, ORR was charged by law with "coordinating and implementing the care and placement" of A.R.M.. 6 U.S.C. § 279(b)(1); *see also* 8 U.S.C. § 1232(b)(1) ("[T]he care and custody of all unaccompanied [noncitizen] children . . . shall be the responsibility of the Secretary of Health and Human Services."). ORR thus remained legally responsible for A.R.M.'s adequate care and safety after it placed her in Cayuga Centers' care.

60.     The shelter conducted blood tests and administered vaccines to A.R.M. without S.M.F.'s knowledge, much less consent. When S.M.F. later learned of this, she was alarmed and disturbed that the center had administered vaccines without any record of A.R.M.'s medical history or knowledge of allergies to medication. Indeed, the initial medical exam form for A.R.M. —later obtained by her immigration counsel—demonstrates that no ORR or Cayuga Centers personnel flagged A.R.M.'s prior diagnosis of and treatment for asthma.

61.     The first time S.M.F. spoke to anyone about A.R.M.'s medical history was around six weeks after their separation. In June 2018, when S.M.F. was scheduled to have her second phone call with A.R.M., the social worker told her that A.R.M. could not be on the video call because she was sick with a fever. When S.M.F. asked whether A.R.M. had been taking her asthma medication, referring to the albuterol inhaler, the social worker asked what medication A.R.M. should have been taking. Even after that phone call, no one ever informed S.M.F. about whether her daughter was ever provided with proper medical attention for her asthma after their separation. S.M.F. felt very concerned, as she knew that A.R.M. had a cough when they were separated and that she had needed her inhaler throughout their travel from Honduras and during their time in the *hielera*. She felt powerless and hopeless because she was unable to care for her daughter.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

62.     S.M.F. found out about much of A.R.M.'s experiences at the shelter only after they were reunited in July 2018.

63.     ORR failed to provide A.R.M. with proper nutrition and sanitation. When S.M.F. met ARM. at the airport in Seattle, she noticed that A.R.M. had lost a significant amount of body weight and that her head was inundated with lice. It took S.M.F. nearly one month to completely treat the head lice. For many weeks after that, there were sores on A.R.M.'s head from the lice.

64.     A.R.M. recounted to S.M.F. that during her forced separation from S.M.F., she sometimes slept in the same bed as other children and was forced to get up early in the mornings. She also recalled that she and other children were scolded if they cried.

65.     A.R.M. was also told by Cayuga Centers staff that her mother had abandoned her permanently. She felt afraid that she would never see her mother again. Later, when she was reunited with S.M.F., she repeated multiple times something she had been taught while separated from her mother: "It's true what they told me. You are bad for my life. You brought me here just to leave me and make me suffer."

66.     After being reunited, A.R.M. was emotionally distant from her mother and unaffectionate for months. She often became angry at S.M.F. and told her she did not want to be with her anymore. A.R.M. also had frequent nightmares from which she woke up screaming, "Mommy don't leave me!"

67.     To this day, A.R.M. still fears being separated from her mother. Any time that S.M.F. is not with her, A.R.M. is vigilant and worried, and calls frequently to check where she is and if anything happened to her. Every few days, A.R.M. goes to her mother's bed to sleep

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

during the night because she is afraid of being alone. She also frequently sleeps with her sibling to escape feeling alone.

68.     A.R.M. continues to exhibit other symptoms of emotional trauma. Her teachers have told S.M.F. that she is not paying attention in school. On multiple occasions, A.R.M. has told her parents that when she looks at a mirror that reflects her parent's bedroom, she sees a woman hanging from the ceiling over her parents' bed. S.M.F. has found notes written by A.R.M. saying that she is not well and telling her family goodbye.

**Defendant's Conduct Harmed Plaintiffs.**

69.     The harm described above was one of the key purposes and desired outcomes of Defendant's employees' actions. Defendant's employees intended to wreak physical, emotional, and mental havoc on S.F.M., A.R.M., and others like them. They succeeded in doing so, causing lasting emotional harm that will remain with S.F.M. and A.R.M.

70.     Defendant's employees caused Plaintiffs to suffer significant physical, emotional, and mental harm in several different ways.

71.     Federal immigration officers subjected S.M.F. and A.R.M. to harsh and cruel conditions in an *hielera*, forcibly separated them, and prolonged their detention. In doing so, the U.S. government unlawfully punished S.M.F. and A.R.M. for seeking asylum in the United States—which is statutorily obligated to adjudicate their claims for protection.

72.     Federal immigration officers further inflicted severe emotional distress on S.M.F. and A.R.M. by separating them from one another without any process, explanation, or information. The two-month-long separation was part of an unprecedented government practice and policy of forced family separation, which was specifically intended to inflict harm on Plaintiffs in callous disregard of their legal rights, personal dignity, and family integrity.

COMPL. – 16
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

73.     As described above, inflicting severe emotional distress on Plaintiffs and other

separated families and children was the very point of the Zero Tolerance policy. Defendant's

employees knew very well that such separation would cause significant and lasting trauma.

Indeed, prior to implementing the policy, a DHS Advisory Panel, ORR officials, and outside

medical professionals warned DHS that implementing a family separation policy would cause

catastrophic emotional and psychological harm to separated children and their parents. *See, e.g.*,

U.S. Immigr. & Customs Enf't, Dep't of Homeland Sec., Report of the DHS Advisory

Committee on Family Residential Centers (Sept. 30, 2016); Jeremy Stahl, *The Trump*

*Administration Was Warned Separation Would Be Horrific for Children, Did It Anyway*, Slate,

July 31, 2018, https://slate.com/news-and-politics/2018/07/the-trump-administration-was-

warned-separation-would-be-horrific-for-children.html; Fernando Stein & Karen Remley, Am.

Acad. Of Pediatrics, *AAP Statement Opposing Separation of Mothers and Children at the Border*

(Mar. 4, 2017), https://www.aap.org/en/news-room/news-

releases/pediatrics2/2017/immigrantmotherschildrenseparationv/.

74.     Defendant's employees acted in blatant disregard of these warnings when they

separated S.M.F. and A.R.M. for several weeks.

75.     S.M.F. experienced severe distress, depression, and anxiety while separated from

her young daughter over two months.

76.     A.R.M. experienced lasting emotional distress and trauma as a result of being

forcibly separated from her mother for more than two months when she was only six years old.

77.     ORR failed to provide A.R.M. with adequate care and safety by placing her in a

shelter without a full understanding of her medical history, subjecting her to vaccination without

parental consent, and failing to ensure proper food and sanitation.

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

78.     As a result of ORR's actions, A.R.M. suffered risks and actual harms to her physical and mental health.

79.     Both S.M.F. and A.R.M. continue to suffer significant emotional and mental trauma because of Defendant's employees' actions.

80.     These harms were not only foreseeable, but also intended.

81.     Defendant is therefore liable to Plaintiffs under the FTCA and relevant state laws.

**CLAIMS FOR RELIEF**

**I. Intentional Infliction of Emotional Distress**

82.      All the foregoing allegations are repeated and realleged as though fully set forth herein.

83.     Defendant's employees acted intentionally and/or recklessly through their implementation of an unprecedented government policy of forcibly separating migrant parents and children.

84.     Defendant's employees engaged in conduct that was extreme and outrageous.

85.     Defendant's employees engaged in conduct that caused Plaintiffs severe emotional distress.

86.     Under the FTCA, Defendant is liable to Plaintiffs for intentional infliction of emotional distress.

COMPL. – 18
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

## II. Abuse of Process

87.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

88.     Defendant's employees abused legal processes within their control when, after initiating a prosecution against S.M.F. under 8 U.S.C. § 1325, they used the resulting legal proceedings to designate A.R.M. an unaccompanied minor.

89.     Defendant's employees improperly made the unaccompanied minor designation, relying on the legal proceedings following the start of S.M.F.'s prosecution to justify the separation of S.M.F. and A.R.M. and to traumatize them.

90.     Even if a temporary separation was legally justified during S.M.F.'s brief time in federal pre-trial criminal custody, any basis to designate A.R.M. as an unaccompanied minor evaporated after S.M.F. was sentenced to time served on May 30, 2018. Defendant's employees nevertheless continued to force separation between S.M.F. and A.R.M. for weeks.

91.     Defendant's employees' abuse of process caused Plaintiffs severe, lasting harm, including emotional distress.

92.     Under the FTCA, Defendant is liable to Plaintiffs for abuse of process.

## III. Wrongful Child Abduction

93.     All the foregoing allegations are repeated and realleged as though fully set forth herein.

94.     S.M.F. was legally entitled to A.R.M.'s custody at all times relevant to this action, except during the brief time she served in federal pre-trial criminal custody.

95.     Defendant's employees, with knowledge that S.M.F. did not consent, compelled her minor child A.R.M. to leave her.

COMPL. – 19
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

96.     Defendant's employees, with knowledge that S.M.F. did not consent, compelled her minor child A.R.M. not to return to S.M.F.

97.     Defendant's employees actively concealed the A.R.M.'s location from S.M.F. even after S.M.F. was returned to immigration custody upon completing her sentence for time served.

98.     Defendant's interference with S.M.F.'s custody of A.R.M. caused Plaintiffs severe, lasting harm, including emotional distress.

99.     Under the FTCA, Defendant is liable to Plaintiffs for wrongful child abduction.

### IV. Negligence – A.R.M.'s Treatment in ORR Custody

100.    All the foregoing allegations are repeated and realleged as though fully set forth herein.

101.    Defendant's agents had a duty to Plaintiff A.R.M. to act with ordinary care and prudence so as not to cause harm or injury to her while she was held at Cayuga Centers under ORR custody.

102.    Defendant's agents failed to act with ordinary care and breached their duty of care owed to Plaintiff A.R.M. As a direct and proximate result of the conduct described in this Complaint, A.R.M. suffered substantial damages.

103.    Under the FTCA, Defendant is liable to Plaintiff A.R.M. for negligence.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

a.      Compensatory damages in the amount of $3,000,000 for harm to S.M.F. resulting from Defendant's conduct;

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611

1    b.     Compensatory damages in the amount of $3,000,000 for harm to A.R.M. resulting

2           from Defendant's conduct; and

3    c.     Such other and further relief as the Court deems just and appropriate, including all

4           equitable relief to which Plaintiffs are entitled.

5    Dated: August 25, 2022.                      Respectfully submitted,

6                                                 s/ Matt Adams
                                                  Matt Adams, WSBA No. 28287
7                                                 matt@nwirp.org

8                                                 s/ Aaron Korthuis
                                                  Aaron Korthuis, WSBA No. 53974
9                                                 aaron@nwirp.org

10                                                s/ Michael Ki Hoon Hur
                                                  Michael Ki Hoon Hur, WSBA No. 59084
11                                                michael@nwirp.org

12                                                Elizabeth Eisenberg,* WSBA No. 54514
                                                  elizabethe@nwirp.org
13                                                *petition for admission forthcoming

14                                                NORTHWEST IMMIGRANT RIGHTS PROJECT
                                                  615 Second Avenue, Suite 400
15                                                Seattle, WA 98104
                                                  Tel. (206) 957-8611

16

17

18

19

20

21

22

23

COMPL. – 21
Case No. 2:22-cv-1193

NORTHWEST IMMIGRANT RIGHTS PROJECT
615 Second Avenue, Suite 400
Seattle, WA 98104
Tel. (206) 957-8611